WATSON BROS. TRANSP. CO., Inc., v. UNITED STATES et al.

Civil Action No. 563.

District Court, D. Nebraska, Omaha Division.

March 24, 1945.

motor vehicle of general commodities (with certain exceptions not requiring enumeration) to and from Rock Island, Moline, East Moline, Silvis, and Carbon Cliff, in Illinois, and Davenport and Bettendorf in Iowa (all included within the general designation of the "tri-cities" area) and Grinnell and Iowa City in Iowa, as intermediate and off-route points on a regular route between Omaha, Nebraska, and Chicago, llinois, following, at all material points, United States highway 6, on which the challenged order recognized in the petitioner authority under 49 U.S.C.A. § 306(a) to render service between termini, theretofore allowed by a previous order of the Commission's Division 5 in the same proceeding.

Lawrence W. Moore, of Omaha, Neb., for plaintiff.

Wendell Berge, Asst. Atty. Gen., Edward Dumbauld, Sp. Asst. to Atty. Gen., and Joseph T. Votava, U. S. Atty., of Omaha, Neb., for defendant United States.

Daniel W. Knowlton, Chief Counsel, and Nelson Thomas, Atty., both of Washington, D. C., for defendant Interstate Commerce Commission.

Before JOHNSEN, Circuit Judge, and DONOHOE and DELEHANT, District Judges.

DELEHANT, District Judge.

The plaintiff, a Nebraska corporation, seeks in this action, brought under the jurisdictional provisions of 28 U.S.C.A. § 41(28), utilized in 49 U.S.C.A. §§ 17(9) and 305(g), to enjoin an order of the Interstate Commerce Commission, through its division 5, made and given on November 18, 1943, in MC–70451, only to the extent that it denies to the plaintiff the authority to render service as a common carrier by

Demand having been made in the complaint, and not withdrawn, for a preliminary injunction, this court was assembled and convened. 28 U.S.C.A. § 47. To obviate the necessity for a separate hearing upon the prayer for preliminary injunction, the Commission by successive supplemental orders, has postponed the effective date of the challenged order. Hearing has now been had upon the merits of the case, both respecting the preliminary injunction and touching permanent relief.

To avoid unnecessary repetition, the several grounds upon which the plaintiff criticises the portion in issue of the Commission's order will be noted in the course of their discussion herein. Essentially, the answer of the defendants denies the plaintiff's allegations of irregularity in the proceedings and report and order of the Commission and affirmatively asserts their regularity and conformity to law.

The Motor Carrier Act of 1935 was approved on August 9, 1935. One of its provisions, being in its present form 49 U.S. C.A., § 306(a), is commonly referred to as "The Grandfather Clause", and, so far as it is material here, is copied in a footnote.[1]

---

[1] Certificate of convenience and necessity: "Necessity for; motor carriers in bona fide operation on June 1, 1935. Except as otherwise provided in this section and in section 310a, no common carrier by motor vehicle subject to the provisions of this chapter shall engage in any interstate or foreign operation on any public highway, or within any reservation under the exclusive jurisdiction of the United States, unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the Commission authorizing such operations: Provided, however, That, subject to section 310, if any such carrier or predecessor in interest was in bona fide operation as a common carrier by motor vehicle on June 1, 1935, over the route or routes or within the territory for which application is made and has so operated since that time, or if engaged in furnishing seasonal service only, was in bona fide operation on June 1, 1935, during the season ordinarily covered by its operation and has so operated since that time, except in either instance as to interruptions of service over which the applicant or its predecessor in interest

MC–70451 was seasonably instituted (within the extended time allowed by the Commission under the authority of 49 U.S. C.A. § 327) on February 10, 1936, by the plaintiff's filing with the Commission of its application for a certificate of public convenience and necessity (based entirely upon alleged operations as of June 1, 1935 and continuously thereafter), granting to, and confirming in, the plaintiff, authority (1) to operate as a common carrier by motor vehicle of general commodities (with exceptions) over a large number of regular routes, located, among other places, between Kansas City, Missouri and Sioux City, Iowa, through Council Bluffs, Iowa, and Omaha, Nebraska, on both sides of the Missouri river; in northeastern Kansas; eastern Nebraska; northwestern Missouri; and southwestern Iowa; from Kansas City, Missouri, to DesMoines, Iowa; and between Omaha, Nebraska, and Chicago, Illinois, over two principal routes, one traversing Iowa on U. S. highway 34, and the other, being the route presently involved, following U. S. highway 6 through Des Moines and Davenport, Iowa, and the Illinois units of the tri-cities area, including in each instance service to all intermediate and off-route points; and (2) to continue certain alleged irregular route operations radiating generally from Omaha, Nebraska, into some twenty-two states, including (a) the carriage of shipments on "call and demand" between various points without regard to route and usually in truckload lots or in lesser quantities for a minimum charge and by special and individual arrangement, and (b) the

transportation of large quantities of meats and other packing house products under written contracts with several major packing companies. By amendment, authority was later sought for regular route operations between Omaha, Nebraska, and Denver, Colorado.

In respect of routes embracing the shipping points here in controversy, the plaintiff claimed rights derived from two sources: (a) In consequence of its own alleged operations between Omaha, Nebraska, and Chicago, Illinois, along U. S. highway 6 through DesMoines, Newton, Grinnell and Iowa City, in Iowa, and the tri-cities area into Illinois and along U. S. highways 6 and 34 to Chicago, Illinois; and (b) by reason of operations between DesMoines, Iowa and Chicago, Illinois, through Pella, Oskaloosa, Muscatine and Davenport in Iowa, over Iowa state highways 163 and 92, and U. S. highway 61, and thence on U. S. highway 6 into Illinois, and through Princeton, Illinois,[2] to Chicago, Illinois, as one route; and on another and alternative route directly through Newton, Grinnell and Iowa City in Iowa, and through the tri-cities area into Illinois and on to Chicago, Illinois, allegedly initiated and carried on prior to and on June 1, 1935, and until January 31, 1936, by North American Freight Lines owned nominally by one John H. Buck of Chicago, Illinois, but said by him actually to have been a partnership operation, and continued subsequent to the date last mentioned by the plaintiff as purchaser from Buck.

Objections were presented by several interested parties and, among others, by the

---

had no control, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate was made to the Commission as provided in paragraph (b) of this section and within one hundred and twenty days after October 1, 1935, and if such carrier was registered on June 1, 1935, under any code of fair competition requiring registration, the fact of registration shall be evidence of bona fide operation to be considered in connection with the issuance of such certificate. Otherwise the application for such certificate shall be decided in accordance with the procedure provided for in section 307(a) of this chapter and such certificate shall be issued or denied ac-

cordingly. Pending the determination of any such application the continuance of such operation shall be lawful."

Sections 310 and 310a have application to dual operation and procedure for temporary authority.

Section 307(a) outlines the statutory requisites for the issuance of a certificate of public convenience and necessity based, not upon antecedent user but upon actual convenience and necessity.

[2] While reference is made to the use of U. S. highway 6, between the tri-cities and Chicago, Illinois, it must be understood that both routes sought by and ultimately allowed to the plaintiff traverse U. S. highway 6 from the tri-cities area to Princeton, Illinois, and thence to Chicago, Illinois, follow U. S. highway 34.

Board of Railway Commissioners of the State of Iowa.

The proper limitations of space forbid a detailed narration of the course of the proceeding before the Commission. But this mere index of developments in it, in chronological order, is set down. Hearings before an examiner were held in Lincoln, Nebraska, on April 29, 1937 (Record, pp. 1–171) and in Omaha, Nebraska, on May 4 and 5, 1937 (Record, pp. 172–553). That examiner presented a recommended report and order as of August 25, 1937; but, upon exceptions by sundry parties, including the applicant, it was not adopted; and, without making any final order, the Commission on November 26, 1937, reopened the proceeding for further hearing generally. The further hearing was had before a second examiner on January 27, 28 and 29 and February 7, 8, 9, 10, 11, 12 and 14 in 1938 at Omaha, Nebraska (Record, pp. 554–1813). The latter examiner presented his recommended report and order on January 7, 1939. On August 9, 1940, the Commission, through its Division 5, made its first Report and Order. Omitting their many other phases and dealing solely with the route and shipping points now involved, that report and order (1) granted to the plaintiff on the basis of its own operations, the right to operate between Omaha, Nebraska and Chicago, Illinois, over U. S. highway 6; (2) granted to the plaintiff, on the basis of the operations of Buck, continued by the plaintiff, the right to operate between DesMoines, Iowa, and Chicago, Illinois, over highways 163, 92, 61 and 6 with intermediate service to and from Pella and Oskaloosa, in Iowa; (3) denied the application, on the basis of Buck's operations, for authority to operate over highway 6, between DesMoines and Davenport, in Iowa, as an alternative route for its Des Moines-Chicago line; (4) granted to the plaintiff the right to continue irregular route service within certain described limits; and (5) denied the right to give intermediate and off-route service to or from the tri-cities, and Newton, Grinnell and Iowa City, in Iowa, or to any point on the Omaha-Chicago direct route except Council Bluffs, Iowa. The order also granted to the plaintiff on the basis of its own operations a right (not presently involved, but closely related to its Omaha-Chicago route) to operate between Omaha, Nebraska and DesMoines, Iowa, over U. S. highway 6 with intermediate service at Council Bluffs, Dexter, Redfield, Adel, Ortonville, and Waukee, Iowa. All of those grants of routes, and denials of routes and the bases thereof remain unopened and unchallenged, so far as service between termini is concerned. The plaintiff promptly sought, and later obtained, a reopening of the cause for further testimony and further consideration, with reference only to the right to serve many intermediate and off-route points on several routes, including Newton, Iowa, and the points involved in this case.[3] Further testimony was taken before a third examiner at Omaha, Nebraska, on February 24, 25 and 26, 1941 (Record, pp. 1857–2234) and, pursuant to adjournment, before a fourth examiner at Omaha, Nebraska, on April 7, 8 and 9, 1941 (Record, pp. 2235–2738). In the course of the several hearings one hundred five exhibits were introduced, comprising many hundreds of pages of data and including numerous summaries or abstracts of shipments and original or duplicate shipping documents. The preparation of the ensuing recommended Report and Order devolved upon the third examiner[4] who on January 1, 1943 served a suggested Report and Order. After submission on June 11, 1943, the Commission, again through its Division 5, on November 18, 1943, made its Report and Order essentially following the third examiner's recommendations; and therein, (1) granted the plaintiff's demand for authority to render intermediate and off-route service to and from certain points on lines not presently involved; (2) authorized general service to and from Newton, Iowa, on the line here involved, from which city a limited transportation of washing machines had been allowed as an irregular route operation in the order of August 9, 1940; and (3) denied the plaintiff's demands in all other respects, including the prayer for the right to serve the points involved in this suit. The plaintiff, thereupon, sought unsuccessfully the re-

---

[3] The order reopening the proceeding bears date February 4, 1941. Originally it included only a part of the nine cities or towns involved in this case, but by a later order, it was broadened to include all of them.

[4] No report or recommendations were made by the fourth examiner who heard about one-half of the 1941 testimony. That testimony was reviewed by the third examiner.

768

opening and reconsideration of, and further hearing in, the proceeding. This case ensued.

A transcript of the oral testimony before the Commission, together with the exhibits introduced in evidence and the presumably material portions of the record in the proceeding before the Commission, was submitted as the evidence upon which this case is to be determined. It has been examined in its entirety.

▮ In a case of this character the inquiry of the court is limited. Controlling judicial decisions have defined its boundaries, beyond which this court must not venture. This proceeding invites neither a trial de novo of the plaintiff's original demand nor a judicial review after the manner of an equity appeal of the Commission's determination. In the exercise of the jurisdiction committed to them under 49 U.S.C.A. §§ 17(9) and 305(g), and 28 U.S.C.A. §§ 41(27, 28) 42–47, "the courts will not review determinations of the Commission made within the scope of its powers or substitute their judgment for its findings and conclusions." United States v. New River Company, 265 U.S. 533, 542, 44 S.Ct. 610, 613, 68 L.Ed. 1165. See also Illinois Central Railroad Company v. Interstate Commerce Commission, 206 U.S. 441, 454, 27 S.Ct. 700, 51 L.Ed. 1128; Assigned Car Cases, 274 U.S. 564, 580, 581, 47 S.Ct. 727, 71 L.Ed. 1204; Swayne & Hoyt, Ltd. v. United States, 300 U.S. 297, 307, 57 S.Ct. 478, 81 L.Ed. 659; United States v. Chicago Heights Trucking Co., 310 U.S. 344, 352, 60 S.Ct. 931, 84 L.Ed. 1243; Gray v. Powell, 314 U.S. 402, 412, 413, 62 S.Ct. 326, 86 L.Ed. 301; Board of Trade of Kansas City v. United States, 314 U.S. 534, 546, 62 S.Ct. 366, 86 L.Ed. 432; Swift & Company v. United States, 316 U.S. 216, 231, 62 S.Ct. 948, 86 L.Ed. 1391; Ziffrin, Inc., v. United States, 318 U.S. 73, 80, 63 S.Ct. 465, 87 L. Ed. 621; Interstate Commerce Commission v. Inland Waterways Corporation, 319 U. S. 671, 691, 63 S.Ct. 1296, 87 L.Ed. 1655; Chicago, St. Paul, M. & O. Ry. Company v. United States, 322 U.S. 1, 2, 3, 64 S.Ct. 842, 88 L.Ed. 1093; Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 522, 64 S.Ct. 1129, 88 L.Ed. 1420.

▮ "The hearing of evidence is an exclusive function of the Commission and it may disbelieve or disregard any evidence as (if?) it seems unconvincing; and it may give as much or as little weight to evidence as (to) it seems proper", Loving v. United States, D.C., 32 F.Supp. 464, 467, affirmed 310 U.S. 609, 60 S.Ct. 898, 84 L.Ed. 1387, and cases there cited, so long as it does not fail or refuse to consider any of the relevant evidence or act arbitrarily or capriciously in the consideration of the evidence presented to it. See also Transamerican Freight Lines v. United States, D.C.Del., 51 F.Supp. 405, 410; Beasley v. United States, D.C.Mo., 47 F.Supp. 468, 469; United States v. Chicago Heights Trucking Company, 310 U.S. 344, 352, 60 S.Ct. 931, 84 L.Ed. 1243.

▮ Even upon recourse to it, the court is not allowed independently to weigh and appraise the evidence before the Commission. It is the Commission's own findings that are to be either sustained or overturned. Generally, too, the court may not, upon its own analysis of the evidence, support an order of the Commission upon a ground or theory other than that relied upon by the Commission.

▮▮ Accordingly, it is uniformly recognized that an order of the Commission will not be enjoined, if it be within the constitutional and statutory jurisdiction of the Commission and made in a case where its exercise of jurisdiction has been competently invoked if a full and fair hearing has been accorded to the parties; and if the order is not arbitrary or capricious, or made without consideration of all of the evidence, or without supporting evidence. "Only questions affecting constitutional power, statutory authority and the basic prerequisites of proof can be raised. If these legal tests are satisfied, the Commission's order becomes incontestable", Rochester Telephone Corporation v. United States, 307 U.S. 125, 140, 59 S.Ct. 754, 762, 83 L.Ed. 1147. See also United States v. Maher, 307 U.S. 148, 59 S.Ct. 768, 83 L.Ed. 1162; 15 C.J.S., Commerce, § 148, p. 554 et seq. These basic limitations upon the exercise of judicial power are not challenged in the instant case. The application of some of them is the burden of the controversy.

▮ That the making of an order denying to a common carrier by motor vehicle of general commodities, authority to render service to and from intermediate and off-route points on a regular route between whose termini the order allows service, is within the clear constitutional and statutory authority of the Commission can not be questioned. 49 U.S.C.A., Sections 17(9)

and 308(a), "Authority to operate within a specified 'territory' may include permission to service all points in that area. On the other hand it may be restricted to designated points therein. Or * * * it may extend to all points in a part of that area and to selected localities in another part. The precise delineation of the area or the specification of localities which may be serviced has been entrusted by the Congress to the Commission." United States v. Carolina Carriers Corporation, 315 U.S. 475, 480, 62 S.Ct. 722, 726, 86 L.Ed. 971; Alton Railroad Company v. United States, 315 U.S. 15, 22, 62 S.Ct. 432, 86 L.Ed. 586; United States v. Maher, 307 U.S. 148, 155, 59 S.Ct. 768, 83 L.Ed. 1162.

The plaintiff does not question either the general jurisdiction of the Commission or its own invitation of the exercise of that jurisdiction by the application resulting in the final order which it now assails. It does undertake to question the jurisdiction to make the particular order now attacked in the light of the record before it. But that objection in reality has pertinence, not to jurisdiction, but rather to its exercise.

 The burden of showing an invalidating infirmity in the challenged order rests upon the plaintiff. Not only is this true in the present case but, in the very nature of the right sought, the burden of establishing the existence of the facts necessary to support its claim in the proceeding before the Commission was constantly upon the applicant therein, the plaintiff here. McDonald v. Thompson, 305 U.S. 263, 266, 59 S.Ct. 176, 83 L.Ed. 164; Alton Railroad Company v. United States, 315 U.S. 15, 25, 62 S.Ct. 432, 86 L.Ed. 586; Gregg Cartage & Storage Company v. United States, 316 U.S. 74, 83, 62 S.Ct. 932, 86 L.Ed. 1283; Crescent Express Lines v. United States, 320 U.S. 401, 407, 64 S.Ct. 167, 88 L.Ed. 127; Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333; Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 512, 513, 64 S.Ct. 1129, 88 L.Ed. 1420; Moore v. United States, D.C.Minn., 41 F. Supp. 786, 790, affirmed 316 U.S. 642, 62 S.Ct. 1036, 86 L.Ed. 1128; Chicago, St. Paul, M. & O. Ry. Company v. United States, D.C.Minn., 50 F.Supp. 249, 252, affirmed 322 U.S. 1, 64 S.Ct. 842, 88 L.Ed. 1093; Transamerican Freight Lines v. United States, D.C.Del., 51 F.Supp. 405.

The court understands the plaintiff to challenge first the essential element of a full and fair trial by the Commission of his application and to charge the Commission with caprice and arbitrariness in its action. This charge involves several specifications each of which will be given brief consideration. It may be observed that no contention is made that in the hearings before any of the examiners, any appearing party was improperly or otherwise restricted in the introduction of testimony in support of its or his position. And the transcript of the evidence conclusively negatives the possibility of such a contention.

It is claimed, however, that material and competent evidence in support of the plaintiff's position was improperly excluded by the Commission in entering its decision. This claim is not, and could not be, bottomed upon the formal refusal by any examiner to receive offered testimony, or any specific item thereof. In the entire record there is no showing of the rejection of any offer of substantial evidence, and no such action is relied upon by the plaintiff. It is rather asserted that such exclusion resulted "in effect" from the Commission's alleged failure to give consideration to all the evidence in the case. In this connection, it is claimed that the final ruling demonstrably rests solely upon the testimony received in the 1941 hearings and ignores that received in 1937 and 1938. Upon this issue the court finds against the plaintiff. Since it forms the basis of much of the plaintiff's argument under all of its separate assignments of invalidity, it will be considered at this point in some detail and will not be further examined under later assignments of error.

 There is, of course, a recognized—though rebuttable—presumption that in reaching its conclusion, the Commission considered all the pertinent evidence before it. Beaumont, Sour Lake & Western Railway Company v. United States, 282 U. S. 74, 86, 51 S.Ct. 1, 75 L.Ed. 221; United States v. Chemical Foundation, 272 U.S. 1, 14, 47 S.Ct. 1, 71 L.Ed. 131; Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333. This presumption fortifies the incidence of the burden of proof already mentioned.

 In reaching its conclusion, what the Commission was required, under the statute, 49 U.S.C.A. § 306(a), to consider and determine in the challenged report and

order was whether, in the light of the evidence before it, the plaintiff had sustained the burden of proving that, on June 1, 1935, either the plaintiff in its own operations between the termini of Omaha, Nebraska and Chicago, Illinois, or Buck in his operations between DesMoines, Iowa and Chicago, over the route allowed in respect of Buck's operations was engaged in bona fide operations in the way of rendering intermediate service at the nine intermediate points now involved and Newton, Iowa, considered severally, though with the possible grouping of the tri-cities area; and that such service had been rendered continuously since June 1, 1935 by the plaintiff as to its own original operations, and by Buck and the plaintiff successively as to Buck's route. The plaintiff's demand based upon Buck's alleged alternative operations over U. S. highway 6 having been denied, and that denial remaining unopened, it seems improbable that consideration was required by the Commission of service by Buck at Grinnell and Iowa City, in Iowa, a consideration, however, which seems to have been given. In this determination, the Commission was obliged to require as the test of bona fide operation, that the service be "substantial, as distinguished from incidental, sporadic, or infrequent". United States v. Carolina Carriers Corporation, 315 U.S. 475, 480, 62 S.Ct. 722, 726, 86 L.Ed. 971; Loving v. United States, D.C.Okl., 32 F. Supp. 464, 466, affirmed 310 U.S. 609, 60 S.Ct. 898, 84 L.Ed. 1387. That inquiry the Commission answered negatively, with the concluding comment: "On the present record we are not convinced that either of the applicant's predecessors conducted any substantial operation to or from the considered points except Newton prior to 1936. The few shipments shown to have been transported were sporadic and moved at remote intervals." The use of the plural "predecessors" is explained by the Commission's evident treatment of the plaintiff's operations under its original corpoate name as those of a predecessor. In its context "remote" manifestly has reference to each other, not, as is argued, to the critical date, June 1, 1935, or to the basic issue before the Commission. That quoted finding of ultimate fact is challenged upon the ground of alleged infirmities in itself and in its previous recital of sundry contributory primary facts and testimony. The complete findings touching the route involved appear in a footnote.[5] The court

---

[5] "Route 9.—The considered points on or along this route, which runs between Omaha, Nebr., and Chicago, Ill., are the intermediate points of Grinnell, Iowa City, and Newton, Iowa, and the intermediate and off-route points in the so-called Tri-Cities area which includes Davenport and Bettendorf, Iowa, and Carbon Cliff, East Moline, Moline, Rock Island, and Silvis, Ill. Applicant claims operating rights from and to these points both as successor to Watson Bros. Transfer Co., and to John H. Buck. These claims will be discussed separately.

"The abstracts of shipments transported by applicant and its predecessor Watson Bros. Transfer Co., list no shipments to or from Grinnell or Iowa City during 1935. During 1936 the only shipments listed in connection with those points are one each of boxwood and envelopes to Iowa City in December 1936. Applicant has however, continuously since prior to June 1, 1935, transported numerous shipments of various commodities to and from Newton. Although the bulk of the shipments consisted of washing machines applicant held out and did transport all available commodities to and from Newton. In this connection it is noted that applicant is presently authorized to transport washing machines from Newton to points in Nebraska east of U. S. Highway 77, over irregular routes.

"During 1935 no shipments are shown to have been transported by applicant to or from any points in the Tri-Cities area except a shipment consisting of a tractor to Rock Island on October 29, 1935, and two shipments of forgings from Davenport in July 1935, one of forgings to Davenport in July 1935, and one each of eggs to Davenport in July and October 1935. No shipments are shown to have moved to or from Carbon Cliff or Silvis during 1935 or 1936, nor to Moline, East Moline, or Bettendorf prior to February 1936. Several shipper witnesses recall having used applicant's service into the Tri-Cities area and to Grinnell but were unable to state definitely when such service was rendered or whether applicant transported their shipments from origin to destination or handled them through interchange with another motor carrier. The testimony of applicant's drivers is equally indefinite as to actual service to and from points on this route.

"A witness who has been Traffic Commissioner for the Traffic Bureau of the Davenport Chamber of Commerce for the past 20 years, first knew of applicant's operations in the Tri-Cities area in 1939

can not infer that, by the designation of specific shipments, the Commission necessarily intended to negative altogether the possibility that the movement of others within the examined interval might be identified in the evidence. But, even thus narrowly appraised, the recital seems not to be mortally vulnerable.

In an effort to demonstrate that the Commission's recital of specific freight movements involving the controverted shipping points conclusively negatives its consideration of the 1937-1938 testimony, the plaintiff in its brief addressed to the court sets out on an "Appendix A", a list of representative shipments, carried by itself as distinguished from Buck, and entitled to consideration. The court has made a comprehensive study of that appendix; has identified each shipment listed in it by its serial number and traced all of them through the testimony in all of the hearings; and has concluded that the appendix fails to serve its purpose. Very briefly (for an adequate examination of it here would be indefensibly long) the analysis will be summarized. The shipments must first be separated into those made on or before June 1, 1935 and those occurring thereafter.

█ Of the former, six items are set out; but two of them refer to the showing on two distinct exhibits of the same shipment, leaving only five real shipments. Two of those, involving identical commodities, moved on January 16, 1934, from Lincoln, Nebraska, presumably in the same truck, one to Davenport, Iowa, and one to Moline, Illinois; but it is not shown with any degree of certainty that they moved entirely to destination in the plaintiff's equipment (vide infra). The remaining three shipments (one of which, incidentally moved from Kewanee, Illinois, instead of Rock Island, Illinois as indicated in the appendix) were introduced into the record as items of Exhibits 64 and 70 in the 1938 hearing, in support of plaintiff's claim of irregular route operations chiefly in truckload shipments, as chartered carriages from point to point, upon "call or demand", and irrespective of route. They are only dubiously, if at all, representative of intermediate local

---

when it established a terminal at Moline. He knew all of the regular truck operators serving that area and was positive that he would have known of an operation of the size alleged to have been conducted by applicant if it had been in existence in 1935 or 1936. Applicant was not listed in any of the telephone directories in the Tri-Cities area in October 1939.

"The testimony of several witnesses who have been employed by certain of the motor carrier protestants or their predecessors since prior to 1935 indicates that practically all of applicant's shipments from and to points east of Des Moines with the exception of Chicago, Ill., were interchanged with such carriers until some time in 1938. In this connection it is noted that a map in applicant's tariff in effect on and prior to the statutory date indicates that its direct service during that period did not extend east of Des Moines and that shipments to points east thereof was handled in connection with other motor carriers beyond Des Moines.

"The abstract of shipments transported by applicant's predecessor, Buck, shows a shipment of steel wire from Chicago to Davenport on May 29, 1935, and a shipment of noodles from Chicago to East Moline on May 27, 1935. Although two other shipments are listed as moving from Chicago to Davenport and Iowa City, respectively in May 1935, applicant had no signed delivery receipts or other documentary evidence to indicate that they were delivered by Buck. Between June 1, 1935, and October 15, 1935, several shipments are listed as moving to Davenport, and Iowa City, three to Rock Island, one to East Moline and three to Moline. Practically all of these shipments moved from or through Chicago. As indicated in the prior report Buck specialized in the transportation of truckload shipments between Chicago and Des Moines. He had no authority from the Iowa Commission to operate over U. S. Highway 6 between Davenport and Des Moines and did not undertake to sell rights over that highway to applicant.

"On the present record we are not convinced that either of applicant's predecessors conducted any substantial operation to or from the considered points except Newton prior to 1936. The few shipments shown to have been transported were sporadic and moved at remote intervals. We therefore conclude that, while applicant should be authorized to continue serving Newton, it has not shown itself entitled to authority to serve the other intermediate and off-route points considered in connection with this route."

service on a regular route between fixed termini.[6] For it has been determined that operations over irregular routes do not provide the requisite continuity to support an application for regular service between fixed termini, Crescent Express Lines v. United States, 320 U.S. 401, 409, 64 S.Ct. 167, 88 L.Ed. 127; United States v. Maher, 307 U.S. 148, 59 S.Ct. 768, 83 L.Ed. 1162; and likewise that a contract carrier's practices will not support a general carrier's permit. Noble v. United States, 319 U.S. 88, 92, 63 S.Ct. 950, 87 L.Ed. 1277. Besides, two of the three cited shipments appear on Exhibit 91 introduced in the 1941 hearing, the Commission's consideration of the evidence in which seems not seriously to be controverted. However, taken at their maximum significance, they show two shipments moving on January 16, 1934, probably in a single car, two on September 4, 1934, and one on September 17, 1934. In the interval between that date and June 20, 1935, more than nine months, not a single shipment is identified in this appendix—nor elsewhere incidentally—as having been carried by the plaintiff itself to or from any of the points involved. This situation fully supports the Commission's characterization of the operations of the plaintiff itself prior to the critical date as "sporadic and at remote intervals", even if "remote" be construed as relating to June 1, 1935, or to the issue generally before the Commission.

Shipments listed on "Appendix A" as moving after June 1, 1935, commence on June 20, 1935, and continue to December 22, 1936. Thirty-two such units are scheduled. But, of these, two are listed three times each (including one which can not be identified at all upon any other hypothesis) and six are listed two times each. Eliminating such multiple showings, twenty-four actual shipments are listed. Of them, seven appear on Exhibit 60 introduced in the 1938 hearings solely in support of a claim of operating rights over that portion of U. S. highway 36 between St. Joseph and Cameron Junction, in Missouri, as one method of operating between St. Joseph, Missouri and DesMoines, Iowa, and two appear on Exhibit 19, introduced in 1937 in support of a claim of operating rights between DesMoines, Iowa, and Kan-

sas City, Missouri. While in each of these nine shipments one of the presently controverted cities is a point either of origin or of destination, the plaintiff's carriage of the shipments east of DesMoines was not the object at which the exhibits were aimed, and is not shown by the exhibits. Indeed, it is rather negatived by the testimony for the plaintiff in 1937 of the general traffic manager of the plaintiff for the then previous seven years except for the period of one year from April 1, 1935, to April 1, 1936, who was also familiar with its operations in that interlude. He had already identified an Exhibit 18, thus: "It shows representative shipments from Kansas City, Mo. to DesMoines, Iowa, *and points beyond DesMoines which we interline with connecting lines at that point.*" And in identifying Exhibit 19, he testified: "Exhibit 19 is the reverse of No. 18. It shows representative movements of shipments southbound from DesMoines to Kansas City. *There again you have the proposition of receiving shipments from connecting lines originating at DesMoines but turning them over to connecting lines assigned to points west and south of Kansas City; also east of Kansas City.*" (Emphasis added in both instances.) The effective periods of Exhibits 18, 19 and 60 concur. Hence, Exhibit 60 is affected by that testimony touching interlining. To be sure, there was other testimony for the plaintiff to the contrary, part of it from the witness last quoted, as well as testimony for the protestants supporting the cited language. It is sufficient to say that the Commission evidently believed the testimony already repeated. Of the remaining fifteen items, ten were listed in either or both of Exhibits 64 and 70 (vide supra) as representative and in support of irregular route operations, and four in Exhibit 56 as representative and in support of the plaintiff's contract carriage of truckload shipments under written contracts with meat packing corporations. Manifestly they were not materially instructive upon the present issue (see authorities supra); and if they be so regarded, then it should be said that all of the ten irregular route shipments and three out of the four packing house contract shipments were again shown in one or more of the exhibits introduced

---

[6] Let it be noted in this connection that, by its Report and Order of August 9, 1940, the Commission, upon the basis of some of such shipments, identified as the first item of irregular-

route operations then allowed to the plaintiff "Agricultural implements and parts thereof, From Carpentersville and Rock Island, Ill., to Omaha, Nebr., and Kansas City, Mo."

in the 1941 hearing. There remains a single shipment of castings weighing 19,-040 pounds from Lincoln, Nebraska, to Davenport, Iowa, on December 22, 1936, concurrently with another similar shipment listed among the ten irregular route shipments. This last item the court has been unable to locate in the 1941 hearings.

"Appendix A", therefore, fails in the court's estimation to impeach in the slightest degree the Commission's analysis of the evidence.

For the same purpose, a further Appendix identified as "D" is inserted into the plaintiff's brief. It lists a total of one hundred forty-two alleged shipments by the plaintiff involving the controverted points, made between July 19, 1935, and December 22, 1936, of which however only eight occurred in 1935, five in July, two in October and one in December. All of these eight movements may be identified in the shipments listed in the Commission's findings, except two less than truckload items shipped from Lincoln, Nebraska, to Davenport, Iowa. And the foundation for their omission is obvious. They were originally stricken from the exhibit on which they were listed, but an effort, clearly supported by the testimony, was made by marginal notations to show that the striking was mistaken. If the uncertainty as to actual carriage by the plaintiff easterly from DesMoines be disregarded, it is probable that the Commission overlooked the correction. But the inadvertence, if it be so, is trivial. In the light of the failure of the plaintiff to show substantial bona fide operation in the way of service by it to and from the points involved on and before June 1, 1935, the history of shipments after that date has little virtue under 49 U.S.C.A. § 306(a).

Of "Appendix D" it may be noted quite significantly that, though it shows very meagre operations by the plaintiff at any time in 1935, and none at all before June 1, 1935, it does disclose a sharply increased service beginning early in April 1936.[7] And elsewhere also it appears that the plaintiff's operations have been expanded since 1936 in striking measure. (See comment infra on current volume.) However, that still leaves the element of substantial service by the plaintiff on and before the critical date documentarily unproved if not actually negatived.

The court observes the discussion in the brief of the plaintiff upon the probative effect of the showing of drafts drawn at the points involved by truck drivers employed by the plaintiff for repairs or motor fuel. The evidence of the drafts has been examined. They can prove no more than that on their respective dates, items of the plaintiff's equipment were in the cities identified by the drafts. They can not possibly prove the rendering of local service to such points, especially since all of them are located on the plaintiff's Omaha-Chicago through line, where the equipment might be expected to be altogether irrespective of the rendition of local service.

Nor is the criticism of the Commission's discussion of Buck's operations more convincing. To demonstrate the asserted infirmity of that discussion, the plaintiff sets out in "Appendix B" of its brief twenty-eight shipments assertedly transported by Buck (reduced in consequence of duplications to twenty-six), three between March 29, 1935, and June 1, 1935, and twenty-three between June 4, 1935, and January 10, 1936, all introduced in evidence in the 1937-1938 hearings; and in "Appendix E" some thirty-four such shipments (not more than thirty-three in consequence of at least one duplication) of which six (accounting for a duplication) moved between February 11, 1935, and June 1, 1935, and twenty-seven from June 11, 1935, to November 14, 1935.

Of the items on the two appendices last noted antedating June 1, 1935, all those appearing in "Appendix E" are explicitly identified in the Commission's quoted discussion except two, which seem to have moved from Chicago to East Moline, both in Illinois. The Commission's discussion does not make express reference to any of

7 While Appendix "D" lists thirteen alleged shipments as having been moved with relation to one or more of the tricities between January 1, and April 1, 1936, analysis of the shipments shows quite conclusively that only three actual truck movements are involved in them; (a) a load of 20,348 pounds of dates from Omaha to Davenport on January 29, 1936; (b) eleven items of seeds, in small individual weights on virtually consecutively numbered shipping documents, and obviously as part of a single movement, on February 19, 1936, from Omaha, four to Rock Island, one to East Moline, and six to Moline; and (c) a tractor plow weighing 18,282 pounds from Omaha to Moline on March 24, 1936.

the three shipments before June 1, 1935, shown on "Appendix B". But each of them, like the omitted two on "Appendix E", is a shipment from Chicago, Illinois, to another Illinois point (this even includes an item listed in the appendix as moving to Davenport, Iowa, whose destination is shown actually to have been Galesburg, Illinois). It is true that the record includes oral testimony and some documentary support from which it might be inferred that those five shipments were carried by Buck to Davenport, Iowa, and from that point delivered to their destinations by others, though in the case of one shipment shown on "Appendix B" a direct receipt by the Illinois consignee casts a doubt on such a conclusion. On the whole record, the Commission may well have regarded the five omitted shipments as exclusively intrastate items. But, however regarded, the paucity of documented shipments carried by Buck on and before June 1, 1935, involving the points in issue clearly warranted the finding of a sporadic character respecting them.

What has already been said touching the effect under 49 U.S.C.A. § 306(a) of the shipments carried by the plaintiff after June 1, 1935, applies equally to those carried by Buck in 1935 after June 1, 1935, and early in 1936.

The plaintiff argues vigorously that the findings of the Commission are discredited because, as it claims, they identify only nineteen specific shipments by the plaintiff and Buck as moving to or from the affected points in 1935 and 1936, whereas, in contrast, its own exhibits identify seventy-two such shipments. Even disregarding the comments already made touching the appendices, it does not appear to the court that the Commission's recitals and the plaintiff's appendices are set down in precisely the same relation as to time. Besides, the Commission's report covers the operations of Buck after June 1, 1935, in terms not of exact figures but rather of general language.

Upon the subject of Buck's sale to the plaintiff criticism is made of the Commission's observation that: "He had no authority from the Iowa Commission to operate over U. S. highway 6, between Davenport and DesMoines and did not undertake to sell rights over that highway to applicant." The first phase of the statement is exactly true. Buck had a permit, issued after, but applied for earlier than, June 1, 1935, to operate between DesMoines and

Davenport via Pella and Oskaloosa. There is testimony in the record that drivers carrying through truckloads for him between DesMoines and Chicago sometimes proceeded by the shorter route over U. S. highway 6 instead of through Pella and Oskaloosa. The Commission's order of August 9, 1940, allowed the more circuitous route and denied the shorter one. It may be remarked that the denial was premised on the absence of evidence of substantial service rather than on the want of a state permit. The Commission appears clearly to have recognized that congress has not conditioned rights under the "Grandfather Clause" on compliance with state laws. Alton Railroad Co. v. United States, 315 U.S. 15, 24, 62 S.Ct. 432, 86 L.Ed. 586. What is principally assailed is the Commission's quoted statement that Buck did not undertake to sell rights over U. S. highway 6 to the plaintiff. But it, too, is correct. The emphasis is on the words, "undertake to". Although in his bill of sale Buck explicitly identified the circuitous route and his permit for it, and made a formal transfer of the permit, he made no express reference to operations over U. S. highway 6 from DesMoines. Undoubtedly the legal consequence of the bill of sale was to transfer whatever rights Buck had over any route, a conclusion which the Commission's language does not assume to question. But Buck did not expressly *undertake* to convey to the plaintiff any rights over U. S. highway 6 in Iowa.

In support of the Commission's finding on August 9, 1940, adhered to in the presently challenged order, that on and prior to June 1, 1935, Buck was not a bona fide operator easterly from DesMoines on U. S. highway 6, his quest of a state permit for operation over the longer route is quite persuasive. In the proposed regularization of his then current operations, it may reasonably be assumed that he would, and did, seek state confirmation of his right to utilize whatever route or routes he was really using. So, his designation of the Pella-Oskaloosa route, without identifying the direct route even alternatively, is quite significant. In the earlier evidence before the Commission, there was also convincing testimony of his intermediate service to Pella and Oskaloosa.

At this point the court grants and allows the defendant's application to supplement the record by the inclusion of a certified copy of the Report and Order of the Commission, dated January 12, 1939, in proceed-

ing MC–F–112, approving the plaintiff's purchase of the operating rights and authority of Buck. That material is instructive upon the fact that the approval was wholly inoperative as a determination of the scope of the rights, if any, which Buck owned and transferred. Notwithstanding the approval of the transfer, the basic question of the effect, under 49 U.S.C.A. § 306 (a), of Buck's operations remained to be determined in MC–70451, and not elsewhere.

Many other detailed criticisms as a showing of arbitrariness and caprice, of statements in the report are made in the briefs, of which specific, but not extended, mention may be made here of a few only.

The plaintiff complains of the emphasis upon documentary proof in the face of the lapse of time since the critical period on and shortly before June 1, 1935, and suggests the possibility of loss, destruction or confusion of documents in the interval. Some testimony touching disorder and confusion in some of the plaintiff's records is disclosed; but there is no real showing of loss or destruction. Such a showing would have to be well fortified for, continuously almost since the critical date, the plaintiff has been aware of the importance of its records; and the present controversy has been either pending or in the making.

It is argued that the Commission's references to "shipper witnesses" and "applicant's drivers" in the plural are formally false and betrayingly insincere and that only one witness of each such character may be identified. From a careful reading of the entire testimony the court is of the opinion that the Commission's language is supportable. Similarly, its statement that to some extent the 1941 testimony was repetitious of that introduced earlier is based not alone, as the plaintiff asserts, on Exhibits 92 and 104 introduced at the 1941 hearings, but also on the whole record. As the court is definitely aware from its own examination, the repetition may be discerned in many phases not reflected in those two exhibits.

A remark made by the fourth examiner on April 8, 1941, in the course of the final hearings is cited as evidence of his asserted personal intolerance of parol evidence of operation, unsupported by documents. But that examiner received the then proffered parol evidence. And it is of interest that he did not make any recommended report in this case. So, his personal estimation of such testimony even if it be mistaken is of no substantial significance.

The Commission's reference to the map inserted in the plaintiff's tariff voluntarily circulated and in effect on and for a short time before, and for some time after, June 1, 1935, is criticised. To the plaintiff's statement that it appeared in the 1941 hearings it may be replied, as the plaintiff elsewhere recognizes, that it originally appeared in Exhibit 4 introduced on the first day of the initial hearings in 1937. And, in that its legend distinguished between its own "Direct Lines Daily" westerly from DesMoines, Iowa and "Direct Connecting Lines Daily" easterly from DesMoines, Iowa, as of its date, the court considers that it was susceptible of the interpretation placed upon it by the Commission, especially when it was appraised with the illumination of other related testimony.

The tariff itself is asserted to be evidence of the points personally served by the plaintiff. That it is not such evidence is apparent from the fact that it quotes rates for service to and from hundreds of stations to which the plaintiff never pretended to render through service, located in part in many states in which the plaintiff never had a regular line. Similar observation may be made upon the evidentiary significance of a comparable tariff circulated and used by Buck.

The plaintiff's registration as of June 1, 1935, under a code of fair competition requiring registration can be evidence of nothing more than the plaintiff's qualification as a bona fide operator as a motor carrier, which is not questioned. It can have no possible pertinence to its service at a disputed point.

■■■ Exception is taken vigorously to the Commission's failure to give persuasive final effect to the parol testimony offered by the plaintiff that at the critical period it held itself out as ready and able to render service to the challenged points. But mere holding out is not enough; it must concur with bona fide operations, to constitute which actual and substantial service is required. Alton Railroad Company v. United States, 315 U.S. 15, 24, 25, 62 S.Ct. 432, 86 L.Ed. 586; McDonald v. Thompson, 305 U.S. 263, 266, 59 S.Ct. 176, 83 L.Ed. 164; United States v. Carolina Carriers Corporation, 315 U.S. 475, 480, 62 S.Ct. 722, 86 L.Ed. 971; Moore v. United States, D.C. Minn., 41 F.Supp. 786, 792, affirmed 316 U.S. 642, 62 S.Ct. 1036, 86 L.Ed. 1128. In-

deed, the service is generally the most persuasive evidence of the holding out, though, of course, they are not identical terms.

■ Certain assignments of inconsistencies between the final report and order and the earlier report and certain examiners' recommended reports and orders have been examined and found to be either insubstantial or unsupported. That, over the long history of the proceeding, some variation in the declared positions of the several acting examiners and in the Commission's own orders may be discerned is true and rather to be expected. The record before the Commission varied considerably from hearing to hearing. Such incidents may not be allowed to overturn the considered final ruling of the Commission. Baltimore & Ohio Railroad Company v. United States, 298 U.S. 349, 370, 371, 56 S.Ct. 797, 80 L.Ed. 1209; Western Paper Makers' Chemical Company v. United States, 271 U.S. 268, 270, 271, 46 S.Ct. 500, 70 L.Ed. 941. 49 U.S.C.A. § 17(5) is not operative, in this instance, to nullify the authority and applicability of the cited cases, for no examiner's recommendation in MC–70451 was suffered by default of exceptions to become a report of the Commission. And not one of them was exactly adopted, though the last one was substantially followed.

■ Here, a digression is made to announce that the defendants' objection to the plaintiff's offer in evidence of the several examiners' recommended reports is overruled and the tendered recommended reports are received in evidence. The court pursues this course as a practical measure. The material involved is actually before the court and has been discussed at extreme length in the plaintiff's briefs. The court can perceive no possible harm in allowing it to remain in the record. But its reception must not be construed as a rejection of the authority of the two opinions of the Supreme Court last cited, which, together with a proper appreciation of procedure before the Commission, denies to the earlier examiners' recommendations the force which the plaintiff would attribute to them.

The court observes throughout the plaintiff's presentation of its position, under the assignment of invalidity just discussed, a disinclination consistently to meet the issue by proof of specific service at the points involved during the critical period on and shortly prior to June 1, 1935. It is especially in respect of that period that the Commission appears to have considered the proof to be inadequate. But in its attempt to refute the Commission's findings in that behalf, the plaintiff quite generally discusses the periods, through June 1935, 1935-1936, through 1935, and through 1936. The statute has prescribed the exact date of cleavage, at and shortly before which on the one hand and on the other hand, after which, an applicant's operations must be measured.

Maintaining further its charge of caprice and arbitrariness and the denial of a full and fair hearing, the plaintiff insists that it was subjected to the operation of an unlawful rule of evidence in that it was held, in the proof of its rights, to compliance with the common law "best evidence" rule. All of its evidence having actually been received, sometimes in the face of objection, this assignment also rests only on the report and order. And, principally, it seems to criticise the emphasis by the Commission upon the comparative absence or scarcity of documentary evidence in support of the plaintiff's claimed operations on and prior to June 1, 1935, and upon the incomplete and informal character of the documents actually submitted. The plaintiff contends in effect that the oral testimony of its own chief officer and of Buck and others, affirmatively stating that such operations occurred, should have sufficed to support the grant of the authority sought.

In this assignment the plaintiff confuses the Commission's actual and altogether proper appraisal, testing and weighing of all the relevant evidence with a supposed rejection or discarding of, or refusal to consider a part of it. It need hardly be observed that, however competent it may be under the liberal rules prevailing in Commission hearings, the oral statement that the statutory service was performed at the prescribed times made by witnesses vitally interested in the outcome of the proceeding, standing alone, would be only doubtfully persuasive. Dealing with a business, which notoriously preserves records and documents attesting its operations, its proponent could expect little credence, if it were allowed to stand unconfirmed by documentary proof. And the plaintiff consistently acted throughout the long proceeding upon that premise. In the initial hearing, it produced supporting documentary evidence. It introduced more at each of the later sessions. The claim of surprise arising from the final order is considered later, but the comment there made has equal pertinence at this juncture.

And the Commission was on solid ground in attributing persuasive significance to the strikingly small amount of supporting records in some instances and the complete want of them in others. The testimony showed that the tri-cities points were highly industrialized communities having an aggregate population of 200,000 and producing a very large annual freight tonnage. The Commission undoubtedly also considered that Grinnell's population was about 5,000, and Iowa City's above 15,000. A motor carrier actually and substantially serving those communities as intermediate points on a route from Omaha to Chicago could be expected abundantly to document such service. And the failure to do it was properly accorded convincing weight. The comments of the report on the absence in many instances of delivery receipts are easily understood and warranted by the manifest obscurity in the proof upon the question of the interlining or transfer of many shipments between the points of origin and destination.

It is also claimed that the Commission wrongfully gave weight to some evidence in negative terms in which certain witnesses produced by the protestants indicated in various ways their failure to observe the operations of the plaintiff until long after June 1, 1935. That evidence was entitled to consideration. It came from men who at the time in question were actively engaged in the localities involved in various phases of the motor transportation business and might be expected to know of the operations of the concerns functioning in it at the points about which they respectively testified. That, until long after June 1, 1935, the plaintiff was unknown to them in the alleged operations on which its claim rested was a circumstance that might properly be weighed by the Commission. Similarly, the Commission was within its rights in considering the testimony of certain witnesses to the effect that easterly from DesMoines for a substantial period of time, including June 1, 1935 and some time thereafter, the plaintiff interlined most of its freight except that destined through to Chicago.

But the weighing of the evidence was the task of the Commission only (supra). It was its function and its right to determine how far, if at all, it would believe and act upon the oral testimony offered by the plaintiff, what weight it would give to its supporting documentary evidence, and how it would appraise the testimony of the witnesses appearing for the protestants. It has performed that office, and the court may not reverse its course.

Without repetition, and upon the basis of the foregoing discussion, the court now announces that it considers to be without merit, the plaintiff's following assignments of invalidity: (a) That the order is void as being premised on findings without substantial basis in, and contrary to, the evidence; and (b) that the Commission's denial of the petitions for vacation and reconsideration of the order and for further hearing was arbitrary, to the extent only that this assignment is based on the inadequacy of the record, factually to support the order. Very largely, the plaintiff's argument in support of those assignments is a reiteration and amplification of its initial discussion of the evidence. And the court will not pursue a like course.

The contention is made and strenuously urged that the findings of fact declared by the Commission are inadequate legally to sustain its order. And a related argument is offered that the order is without a sound logical basis or rationale. These positions upon due examination in the light of the record and the evidence are not well taken.

In the first place, the Commission is not obliged to include in its report precise and detailed findings of fact and conclusions of law comparable to those required, under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, of a judge who tries a civil action without a jury. The applicable statute, 49 U.S.C.A. § 14(1), follows: "Whenever an investigation shall be made by said commission, it shall be its duty to make a report in writing in respect thereto, which shall state the conclusions of the commission, together with its decision, order, or requirement in the premises; and in case damages are awarded such report shall include the findings of fact on which the award is made." The statutory specification of the only occasion on which findings of fact are required serves strikingly to emphasize their dispensation in other circumstances. Further significance lies in the history of the quoted provision, approved in 1906, which was amendatory of an earlier section requiring findings of fact in all commission reports. What are presently required in cases of this character are only

"quasi jurisdictional findings, essential to their constitutional or statutory validity [of the orders]." United States v. Baltimore & Ohio Railroad Co., 293 U.S. 454, 463, 464, 465, 55 S.Ct. 268, 273, 79 L.Ed. 587; Visceglia v. United States, D.C.N.Y., 24 F. Supp. 355. And even where factual findings are required, only the ultimate, as distinguished from the evidentiary or primary, facts need be found; and those without separately identifying and numbering them. Meeker v. Lehigh Valley Railroad Co., 236 U.S. 412, 35 S.Ct. 328, 59 L.Ed. 644, Ann. Cas.1916B, 691; Mills v. Lehigh Valley Railroad Co., 238 U.S. 473, 35 S.Ct. 888, 59 L.Ed. 1414.

The duty of the Commission thus prescribed seems to have been performed faithfully. The ultimate facts of the absence of substantiality in the service at the affected points within the critical period, of both Buck and the plaintiff; the small number of, and wide intervals separating, applicable shipments and their sporadic character were sufficiently set down; and were supported by the evidentiary or primary facts, to the extent that the Commission elected without statutory compulsion to set them out; and in turn fully supported, warranted and necessitated the order made. See citations supra requiring substantiality of service.

So far as the asserted absence of rationale in the order does not depend on the element just noted, it seems to rest on an alleged want of consistency (a) between the challenged order and the Commission's earlier order and the suggested reports of examiners; and (b) with itself.

The court can perceive no basic incongruity between the two orders of the Commission. One who has carefully perused and analyzed the testimony and exhibits before the Commission will not be scandalized by any minor inconsistencies that actually exist in the Commission's rulings, or for that matter in them and the examiners' recommendations. But upon the one and only point vital to that portion of the final order now challenged there is no semblance of inconsistency. Apart from an oblique dictum in an earlier examiner's recommended report, there is no finding of supporting intermediate service either by Buck or by the plaintiff to or from any of the points involved.

The supposed intrinsic inconsistency of the final report and order seems to lie chiefly in the denial of the right to serve the litigated points, in contrast with (a) the con-

current enlargement of a limited irregular route service at Newton, Iowa, to full intermediate service on the regular route here involved; and (b) the allowance of local service at Burlington and Ottumwa, in Iowa, on the plaintiff's Omaha-Chicago route via U. S. highway 34; and (c) the grant of the right to give local service at several small points on other routes running principally in southwestern Iowa and southeastern Nebraska. Service to the last mentioned points was abundantly supported by testimony quite unrelated to that involving the operations through the tri-cities, Iowa City and Grinnell. The same may be said, though less emphatically, of Burlington and Ottumwa, Iowa. In respect of Newton, Iowa, the evidence might very well have supported a denial of intermediate regular route service and the retention of the limited irregular route service, although there was far more evidence of specific general service to it than to the comparable points of Grinnell and Iowa City. Here, in the view most favorable to the plaintiff, is an instance where substantial indulgence was allowed the plaintiff. And it ought not to complain about it, or seek to use it as a bludgeon to coerce the grant of a still more dubious privilege.

It is finally charged that the Commission was arbitrary and capricious and unreasonable in the denial of the plaintiff's petitions for vacation and reconsideration of the order, and for further hearing. Passing over, as already adequately considered, the specification of the Report and Order's departure from the evidence, the factor of surprise issuing from the order is noted. That point has already received some consideration in another relation. It has even less virtue under this assignment. That the plaintiff at all times during the progress of MC–70451 knew of the probative significance and importance of documentary proof of service is too apparent for further comment. But what is more significant, every suggested report and the earlier Commission's report emphasized it. And, lastly, but most significantly, the final recommended report and order, essentially indistinguishable in any presently material regard from the challenged order, was served on January 1, 1943, at which time the plaintiff was granted due time within which to except to it. Though the intervening record is not before the court, it may be assumed that exceptions were filed, for the recommended Report and Order did

not become the Commission's action. On the contrary, the matter was not finally submitted for five months and ten days. Surprise is, therefore, demonstrably negatived.

So far as the proposed additional testimony is concerned, it is acknowledged by the plaintiff that it is not "newly discovered", and it is also manifestly and admittedly cumulative. Its tender could not possibly support a reopening order, much less compel one.

And in the light of the controlling decisions of the Supreme Court, this court is quite unwilling to disturb the ruling of the Commission on the issue of reconsideration or reopening. The plaintiff finds comfort in this connection in Atchison, Topeka & Santa Fe Railway Company v. United States, 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273. But in United States v. Northern Pacific Railway Co., 288 U.S. 490, 53 S.Ct. 406, 77 L.Ed 914, and Baltimore & Ohio Railroad Company v. United States, 298 U.S. 349, 389, 56 S.Ct. 797, 80 L.Ed. 1209, and more recently and emphatically in Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 64 S.Ct. 1129, 88 L.Ed. 1420, the Supreme Court has, since the delivery of the Santa Fe opinion, very narrowly restricted its authority in support of the judicial nullification of a Commission's order denying rehearing or further hearing.

■■■ An objection urged under every assignment in the plaintiff's brief, and insisted upon in this final phase, is that the practical operation of the Commission's order will involve the plaintiff's deprivation of the right to haul freight which currently aggregates annually many millions of pounds and produces several hundreds of thousands of dollars in yearly gross revenue, and in the destruction or substantial impairment of the value of certain expensive local freight handling facilities installed in 1939 in the tri-cities. Within the permission of the statute, the plaintiff has continued and greatly expanded its operations during the pendency of the proceeding before the Commission. But the outlay of capital investment mentioned occurred, pendente lite, and must always have been understood to be at the risk of failure in the case. Besides, the current magnitude of an applicant's operations, except in so far as it contributes to the proof of bona fide continuance of operations after June 1, 1935, is no measure of its rights under 49 U.S.C.A. § 306(a). It may, indeed, be highly instructive upon the issue of actual pub-

lic convenience and necessity if an application be presented for a certificate under 49 U.S.C.A. § 307(a). But that question is not before the court.

On the issues and the record before it, this court finds against the plaintiff and denies it the relief it seeks. Formal findings and order accordingly are being filed.