**UNION PACIFIC RAILROAD COM-
PANY et al., Plaintiffs,**

v.

**UNITED STATES** of America and In-
terstate Commerce Commission,
Defendants.

Civ. 02981.

United States District Court
D. Nebraska.

May 27, 1969.

Raymond E. McGrath, of McGrath, North, Nelson & Shkolnick, Omaha, Neb., and Howard J. Trienens, of Sidley & Austin, Chicago, Ill., for plaintiffs.

Gerald Vitamvas, Deputy Atty. Gen., for the State of Nebraska and Richard W. Sabin, Asst. Atty. Gen., State of Oregon, Salem, Or., for twenty-two intervening States.

William Tighe, Asst. U. S. Atty., for the District of Nebraska and Robert W.

Ginnane, Gen. Counsel, I.C.C., Washington, D. C., for defendants.

Harry Otis, of Gaines, Spittler, Neely, Otis & Moore, Omaha, Neb., and Richard R. Bongartz, Philadelphia, Pa., for Penn Central Co.

Harry Otis, Omaha, Neb., and John C. Danielson, Chicago, Ill., for Chicago & Northwestern Railroad Co.

William J. Brennan Jr., of Fitzgerald, Brown, Leahy, McGill & Strom, Omaha, Neb., and David G. MacDonald, Washington, D. C., for Southern Railroad Systems.

Stephen G. Olson, of Fraser, Stryker, Marshall & Veach, Omaha, Neb., and Gen. Sol. Raymond K. Merrill, Chicago, Ill., for Milwaukee Railroad.

Before LAY, Circuit Judge, and ROBINSON and VAN PELT, District Judges.

## MEMORANDUM

RICHARD E. ROBINSON, District Judge.

This is an action to set aside an order of the Interstate Commerece Commission prescribing rental rates to be paid by railroads for the use of freight cars owned by another railroad. The Commission's order dated January 17, 1968, was entered in its Dockets No. 31358, 33145 and 34405, Chicago Burlington & Quincy R. Co. et al., v. New York Susquehanna & Western Railroad Co. et al., 332 I.C.C. 176. The plaintiff railroads seek relief because of alleged violations of the Interstate Commerce Act and the Administrative Procedure Act.

This Court has jurisdiction under the statutory authority provided in 28 U.S.C. §§ 1336, 1398, 2284 and 2321–2325, inclusive, and 5 U.S.C. §§ 701–706, inclusive. The venue requirements of 28 U.S.C. § 1398 have been observed as the principal offices of one of the plaintiffs, Union Pacific Railroad Company, are located in the District of Nebraska.

The order of the Commission prescribing the basis of the rates to be paid by railroads for the use of freight cars

owned by another railroad was to take effect on October 1, 1968. The date was extended to November 15, 1968, by an order of the Commission. On November 7, 1968, this Court entered an order enjoining the enforcement of the Commission's order during the pendency of this litigation.

For more than 60 years railroads have paid for the use of another railroad's freight cars on the basis of a per diem rate. The level of this rate has been set by the Association of American Railroads or its predecessor organizations. Prior to 1953 the determination of the per diem rate was voluntarily accepted by the railroads. In that year, however, when the per diem rate was raised from $2.00 to $2.40, several Eastern railroads refused to pay the increased amount. They have continued to use the cars of other railroads, but insist on per diem rates which are less than are being paid and collected by all the major railroads.

A number of railroads filed a complaint with the Commission against the dissenting group of railroads, seeking a declaration that the new rates of the Association of American Railroads were just and reasonable and an order requiring all railroads to observe them. Following the filing of the complaint with the Commission, more than 100 private lawsuits were initiated in the United States District Court for the Southern District of New York. Two actions were filed in the New York State Courts. These suits were brought to collect from the dissenting railroads the increased amounts of per diem which they have refused to pay. A few of the suits have been settled, but most have been held in abeyance pending a decision by the Commission on per diem rates.

In 1955 the Commission issued its decision that the Association of American Railroads per diem rates [$1.75 and $2.00 per day during different past periods and the then existing $2.40 per day] were just and reasonable and that uniform per diem rates for all railroads were required. Chicago, B. & Q. R. Co. v. New York, S. & W. R. Co., 297 I.C.C. 291 [1955].

On review, however, the Commission's decision was reversed by the United States District Court for the District of Massachusetts. With specific reference to the issues relevant here, the court found: [1] a need to more accurately determine car-line costs; [2] a need to collect data and to consider mileage as a possible second factor with time for allocation of per diem costs; [3] an error in using car age as a factor in computing car utilization; and [4] a possible impropriety in the use of reproduction value in place of ledger value in computing depreciation and return on investment for per diem purposes. Boston & Maine R. Co. v. United States, 358 U.S. 68, 79 S.Ct. 107, 3 L.Ed.2d 34 [1958].

The Supreme Court noted that the reviewing court "pointed out that the Commission had erred in considering the repairs, depreciation and 'car day divisor' components of the per diem," but that "it rested [its] decision on the Commission's summary rejections of an alternative method of compensation, which would introduce a mileage factor into the per diem, advocated by certain of the terminal roads." The Supreme Court also noted that the Commission had indicated that further investigation and more detailed findings would be required to comply with the reviewing court's opinion, and recognized that "[S]hould such proceedings lead the Commission to reconsider its estimate of the desirability of a per diem embracing a mileage factor, the result might well be not a declaration that the present per diem is just and reasonable but the establishment of a new rate." Boston & Maine R. Co. v. United States, supra at p. 72, 79 S.Ct. at p. 109.

The proceedings were reopened for further hearings in 1959. At the same time the Commission instituted a new proceeding under Section 1 [14] [a] of the Interstate Commerce Act for the purpose of prescribing the compensation to be paid by all railroads for rental of freight cars in future periods. Docket No. 33145, Railroad Freight Car Per Diem Charges.

All railroads were made parties to this new proceeding. The Commission's Cost Section was directed to secure and develop pertinent cost data, including cost allocation on a time and mileage basis. It took the Cost Section, with the cooperation of the railroads, three years to complete its study and develop a formula for computing car rental charges from time to time in the future. The study did not include ascertainment of costs by car types.

Hearings on reopened Docket No. 31558, consolidated with Docket No. 33145, began in January, 1963. The hearings continued for more than 50 days. The record eventually contained over 10,000 pages of transcript and over 400 exhibits.

The per diem rate had reached a level of $2.82 when on January 1, 1964, the industry put into effect a new system of per diem rates in which cars were grouped within defined value ranges and a separate per diem was established for each group. This system did not incorporate a separate mileage factor, but did use reproduction cost rather than ledger value in computing the depreciation and return on investment components of the several rates established. While the hearings were in progress, the Southern Railway Company and its affiliates filed a complaint under Section 1 [14] [a] of the Interstate Commerce Act in Docket No. 34405, Southern Ry. Co., et al. v. Pennsylvania Railroad Co., et al., attacking the new multilevel per diem rates and requesting the Commission to prescribe reasonable per diem rates for the future. On March 6, 1964, the complainants in Docket No. 31358 amended their complaint so as to bring in issue the multilevel rates. Consolidation of Docket No. 34405 with the other two dockets followed.

The Hearing Examiner issued his recommended report and order in December, 1965. In May, 1966, Congress amended Section 1 [14] [a] of the Interstate Commerce Act. The statute, as amended, reads as follows [the 1966 amendment italicized]:

"The Commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroad subject to this chapter, including the compensation to be paid and other terms of any contract, agreement, or arrangement for the use of any locomotive, car, or other vehicle not owned by the carrier using it [and whether or not owned by another carrier], and the penalties or other sanctions for non-observance of such rules, regulations, or practices. *In fixing such compensation to be paid for the use of any type of freight car, the Commission shall give consideration to the national level of ownership of such type of freight car and to other factors affecting the adequacy of the national freight car supply, and shall, on the basis of such consideration, determine whether compensation should be computed solely on the basis of elements of ownership expense involved in owning and maintaining such type of freight car, including a fair return on value, or whether such compensation should be increased by such incentive element or elements of compensation as in the Commission's judgment will provide just and reasonable compensation to freight car owners, contribute to sound car service practices [including efficient utilization and distribution of cars], and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and the national defense. The Commission shall not make any incentive element applicable to any type of freight car the supply of which the Commission finds to be adequate and may exempt from the compensation to be paid by any group of carriers such incentive element or elements if the Commission finds it to be in the national interest.*"

On June 23, 1966, the Commission instituted Ex Parte No. 252, Incentive Per Diem Charges. The purpose of the proceeding was to implement Section 1 [14]

[a] of the Interstate Commerce Act, as amended, which the Commission construed as requiring it, after consideration of the national level of ownership of each type of freight car and other factors affecting the adequacy of the national freight car supply, to determine whether the compensation for the use of such cars should be increased by incentive elements. The Commission stated that it intended to consider whether an incentive per diem charge of $2.50 or some other amount should be prescribed on an interim experimental basis and thereafter to conduct a further investigation for the purpose of prescribing an incentive per diem rate or rates on a continuing basis as needed.

Immediately subsequent to this announcement certain of the plaintiff railroad sought to reopen Docket No. 33145 and requested further hearings in the proceedings in light of the amendment to Section 1 [14] [a]. The Commission dedenied the petition. The investigation in Ex Parte No. 252 was completed, and the Commission's decision in it was filed on October 25, 1967, Incentive Per Diem Charges, 332 I.C.C. 11. The Commission concluded that reliable factual information upon which an interim incentive charge could be based was not available and therefore it had no recourse except to undertake further studies to develop such data. No appeal was taken from that decision. On December 15, 1967, the Commission did institute a proceeding in Ex Parte No. 252, Sub. No. 1, Incentive Per Diem Charges—1968, directed to the question of determining an incentive per diem charge. Studies thereunder are now in process.

During the period of the per diem proceedings the Commission had been engaged in other proceedings aimed at improving car utilization. On December 20, 1963, it had initiated a proceeding [Ex Parte 241, Investigation of Adequacy of Railroad Freight Car Ownership, Car Utilization, Distribution, Rules and Practices] designed to achieve a more efficient use of the existing freight car supply through the promulgation of strin-gent rules regarding car service. The Commission noted that the objectives of Ex Parte 241 were complementary to those in Ex Parte 252, since the use made of existing cars is "a significant factor in the adequacy of service which the national freight car fleet can supply." Incentive Per Diem Charges, supra, p. 18. On January 23, 1968, the Hearing Examiner in Ex Parte 241 found that the record did not contain competent evidence upon which to base a conclusion as to the adequacy of freight car ownership and that the adoption of a proposed car ownership formula for determining ownership responsibility of the individual railroads by car types and regulations and car service rules was not shown to be justified. Exceptions were filed to the Hearing Examiner's report and a decision by the Commission is pending.

While the incentive per diem proceeding and the car service proceeding were in process, the Commission issued its report and order which are under review here. In its decision the Commission prescribed a basis of rates for the future to be paid by all railroads for the use of another railroad's freight cars as well as made a finding as to the rates which should be applied between defendants to the original complaint, as amended, and other railroads over the past 15 years. Its prescription of basic per diem [as distinguished from incentive per diem] was a substantial departure from any previously adopted formula. Instead of a single rate per day for a given freight car, the Commission's order required that the rate be calculated by adding [1] a rate per day and [2] a rate per mile times the miles run by that car. And instead of nine separate rates per day depending upon the investment per car [as under the existing multilevel rate structure], the Commission prescribed 147 separate rates per day depending upon the cost and age of the particular car.

The plaintiff railroads seek a reversal of the Commission's order on two grounds: [1] the Commission's failure and refusal to consider factors bearing upon the national freight car supply in

prescribing compensation for freight cars violates Sections 1 [14] [a] of the Interstate Commerce Act as amended; and [2] the Commission's determination of the depreciation and capital costs of freight car ownership violates Sections 7 [d], 8 [b] and 10 [e] of the Administrative Procedure Act.

In reviewing the Commission's order it is appropriate to observe the proper limitations upon the scope of this Court's inquiry and action. It is not our function to determine what would be fair and reasonable car rental rates. This responsibility belongs to the Commission. Furthermore this Court is not obliged to examine each detail of the Commission's decision. If the total effect of the order is not unfair and unreasonable, judicial inquiry ends. Our authority in a review of this kind is no more, but no less, than was stated in Watson Bros. Transp. Co. v. United States, 59 F.Supp. 762, 768 [D. Neb. 1945]:

"[I]t is uniformly recognized that an order of the Commission will not be enjoined, if it be within the constitutional and statutory jurisdiction of the Commission and made in a case where its exercise of jurisdiction has been competently invoked if a full and fair hearing has been accorded to the parties; and if the order is not arbitrary or capricious, or made without consideration of all of the evidence, or without supporting evidence. 'Only questions affecting constitutional power, statutory authority and the basic prerequisites of proof can be raised. If these legal tests are satisfied, the Commission's order becomes incontestable.' "

In interpreting the statute regarding the per diem to be prescribed, the Commission stated that:

"Section 1 [14] [a] authorizes the Commission, after hearing, to establish reasonable rules, regulations, and practices with respect to car service, including the compensation to be paid and other terms of any contract, agreement, or arrangement for the use of any car now owned by the carrier using it.[7]

[7.] Customarily referred to as a "foreign car."

"In prescribing the compensation for the use of foreign cars pursuant to Section 1 [14] [a] of the act, the Commission is exercising its statutory authority to establish basic per diem predicated upon costs. The owner of a car, required, to release possession thereof to another carrier for the further transportation of the freight it contains, may not be deprived of its use without compensation. On the other hand, the carrier obtaining the use of the car is required to accept possession for the purpose of continuing the transportation, and may not be required to pay therefor more than the average cost it would have incurred as the owner of the car or by use of its own car. The two requirements cannot be met except by calculation of the average ownership burden based upon costs, measured with such accuracy as is reasonably possible and distributed among the car users and owners in a manner which can be found most equitable to all. We agree with the conclusion of the examiner that the 'compensation' mentioned in section 1[14] [a] of the act relating to 'basic' per diem does not include any element of profit to the owner of the car and may not be measured by the benefit which the user derives from use of the car. Per diem charges are in the nature of a reciprocal charge and are designed to represent the average cost of car ownership. The charge should be equivalent to the average car ownership costs which the users would have to bear if they owned the car. See Virginia Blue Ridge Ry. Co. v. Southern Ry. Co., supra; Jefferson & Northwestern Ry. Co. v. M. K. & T. Ry. Co., supra; Marcellus & Otis Co., v. N. Y. C. R. R. Co., 104 I.C.C. 389, 392, Rules for Car-Hire Settlement, supra; Keith Ry. Equipment Co. v. Assn. of American Railroads, 274 I.C.C. 469, 482; Palmer v. United States, 75 F.Supp. 63. 'It has long been generally recognized that car hire, however, established, should be enough reasonably to compensate the car owner for its costs of own-

ership and no more \* \* \*.' Boston & Main Railroad v. United States, supra.

"This conclusion is confirmed by the 1966 amendment to section 1 [14] [a] and the statutory history relating thereto. The basic per diem charge may not be used, or include sums as elements of compensation, to enforce car service rules, encourage car acquisition, et cetera; these functions being reserved for the added incentive element when found justified.

\* \* \* \* \* \*

"In its prior form, this statute also required the compensation to be reasonable and we do not view the added language as making any change in this respect.[8]

8. Thus at Cong.Rec.-House, May 12, 1966, page 9945 "The amendment first restates in clear language what the courts have held to be the limitations of the law as it is now written."

As a result of this amendment, however, the function and composition of basic per diem rates have been clarified. They are applicable to per diem cars generally, and are to be computed solely on the basis of elements of ownership expense involved in owning and maintaining the cars, including a fair return on value. Per diem charges may not include any amount for the value of the use of a car. See Cong. Rec. —House—May 12, 1966, page 9946.

"There is sound reason why these per diem charges should constitute no more than a sharing of cost. We are not concerned with the problem of calculating proper charges to customers of the respondents, but with the assignment among a group of carriers engaged in multitudinous joint ventures, of the burden of acquiring and maintaining the vehicles used by all. Not only is their use compulsory on the paying line but a great deal of the use which is made and for which charges are paid is not productive of revenue to the user. This occurs on empty return of cars to owners which, in many instances, is accomplished by carriers who did not participate in the loaded revenue movement which took the car off line. The relationship of the parties is not that of a lessor and lessee, and the term 'rent' frequently employed to de-

scribe the per diem charge does not connote such a relationship.[9]" Chicago, B. &

9. In the instance where a carrier makes use of a foreign car for movements in violation of the car service rules, it can more reasonably be said that it is "renting" the car. Conceivably, a higher charge would be appropriate in such instances but this is a problem having to do with penalty charges to enforce the car service rules, not with compensation to the owner for the ownership burden.

Q. R. Co. et al., v. New York S. & Western R. Co., et al., supra pp. 186–188.

As if to underscore its conclusion that only the elements of ownership expense involved in owning and maintaining the freight cars are to be considered in determining the basic per diem rate, the Commission subsequently rejected a formula which purportedly would more effectively aid the national policy of improving car supply and service, saying "our function in this proceeding is to determine reasonable rates which must be fair and equitable to all parties. Secondary results, however, beneficial, cannot be transformed into a principle to govern the determination of the rates in this case." Chicago, B. & W. R. Co., et al., v. New York S. & Western R. Co., et al., supra p. 223.

■ The plaintiff railroads vigorously contend that under the statute as amended the Commission cannot lawfully refuse to give consideration to car supply factors when it enters an order prescribing the compensatory per diem for the use of freight cars. We do not read the statutory language as providing such a requirement nor can we reconcile the plaintiffs' proposition with the intent of the amendment which the legislative history makes so clear.

Prior to the enactment of the amendment the Commission's authority was limited to the prescription of basic per diem, an amount which reimbursed an owner of a freight car for his costs of ownership and no more. When the Commission attempted to impose a penalty per diem, which would return to an owner rentals in excess of the cost of ownership, in Increased Per Diem Charges on

Freight Cars, 268 I.C.C. 659 [1947], its decision was set aside on review in Palmer v. United States, 75 F.Supp. 63 [D.D.C.1947]. *Palmer* held that basic per diem must be determined solely with reference to ownership and maintenance costs and a fair return on value to the owning railroad. The imposition of any additional amount per diem as an incentive to encourage improved car supply practices was held to be beyond the Commission's statutory authority.

Not surprisingly, those seeking relief from the national freight car shortage began in earnest to pursue their cause on Capitol Hill. Bills were introduced in session after session of Congress to broaden the scope of the Commission's authority in prescribing per diem rates. S. 1098, introduced in the 1st Session of the 89th Congress, was the bill which finally passed. In its original form the bill provided for inclusion of incentive compensation factors in the per diem rates on all cars and for the use of a single standard combining cost factors with incentive factors. In addition, the bill proposed to change the Commission's power to set per diem compensation by substituting a value-of-use measurement for the existing actual ownership cost basis. S. 1098 was reported out of the Commerce Committee on June 30, 1965 and, remarkably, on the same day passed the Senate.

The House Committee on Interstate and Foreign Commerce amended the Senate bill by striking out all of the language after the enacting clause and inserting new language. The incentive element provided in the House substitute became applicable only to types of freight cars which are found to be in short supply and not to the car fleet generally. The language in the House substitute is explicit: "In fixing such compensation to be paid for the use of any *type* of freight car, the Commission shall give consideration to the national level of ownership of such *type* of freight car and * * * The Commission shall *not* make any incentive element applicable to any *type* of freight car the supply of

which the Commission finds to be adequate * * *" [italics added].

Both versions of S. 1098 defined the basis for fixing compensation by an "either/or" prescription. The original Senate version defined the ordinary basis for fixing compensation as: "determine whether compensation should be computed on the basis of elements of ownership expense involved in owning and maintaining freight cars, including a fair return on value [which return shall be fixed at such level as in the Commission's judgment will encourage the acquisition and maintenance or an adequate car fleet] or * * *". In the House substitute the language became: "determine whether compensation should be computed solely on the basis of elements of ownership expense involved in owning and maintaining such types of freight car, including a fair return on value or * *". The word "solely" was inserted and the parenthetical statement of the original Senate Bill was eliminated. The parenthetical language would have broadened the Commission's power to set compensation in the ordinary sense by including an incentive element, which the insertion in the House bill of the word "solely" clearly precluded.

The alternative power relative to providing incentive compensation was also described differently in the two versions. In the original Senate bill the language read: "or should be computed on the basis of elements reflecting the value of use of freight cars, or upon such other basis or combination of bases as in the Commission's judgment will provide just and reasonable compensation to freight car owners, contribute to sound car service practices, and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and the national defense." In the House substitute version, this language was changed to read: "or whether such compensation should be increased by such incentive element or elements of compensation as in the Commission's judgment will provide just and reasonable compensation to freight car owners, con-

tribute to sound car service practices [including efficient utilization and distribution of cars] and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and the national defense."

It is clear that in the original Senate version the Commission was given the choice of using ordinary cost elements with a "return" factor described to encourage improvement in the car supply or a completely different basis described as "value of use or such basis or combination of bases as the Commission might choose." In the form the bill was passed by the Senate the Commission would have authority to select the basis to be used, subject only to the defined objectives. The House substitute version left undisturbed the standards under existing law by which compensation is to be generally fixed for all cars and limited the determination and application of the incentive element as an additive to the basic rates on specific types of cars found to be in short supply.

The legislative history supports the foregoing analysis. House Report No. 1283 on S. 1098, as amended, contains this statement:

"If the committee amendment is enacted, the Commission in fixing compensation under existing Section 1 [14] [a] of the Interstate Commerce Act will be empowered, in the same proceeding, to go beyond the basis of elements of ownership expense in computing compensation. Where warranted consideration may be given as to whether such compensation should be increased by an incentive element or elements which will encourage acquisition and maintenance of an adequate car supply. This will be a discretionary power but the Commission will not be allowed to make any incentive element applicable to any type of freight car the supply of which the Commission finds to be adequate."

Congressman Staggers, Chairman of the House Commerce Committee and floor manager of the bill, gave the following explanation of the Committee substitute:

"The committee amendment to the Senate bill sharpens up the authority given to, and the standards to be employed by, the Commission in determining these per diem charges.

"The amendment first restates in clear language what the courts have held to be the limitations of the law as it is now written. The commission in establishing the compensation to be paid under terms of any contract or arrangement for the use of a type freight car shall compute this compensation on the basis of arrangements of ownership expense involved in owning and maintaining such type of freight car, including a fair return on value.

$$* \qquad * \qquad * \qquad * \qquad * \qquad *$$

"Second the amendment gives the Commission the discretionary power to increase this compensation by an incentive element to encourage the acquisition of an adequate supply of freight cars but it gives such power only by type of freight car, and the Commission is not allowed to make any incentive element applicable to any type of freight car, the supply of which the Commission finds too adequate.

$$* \qquad * \qquad * \qquad * \qquad * \qquad *$$

"In the third place, the committee amendment provides that the Commission would be empowered in its discretion to exempt from the incentive element provision any group of carriers where the Commission finds such exemption to be in the national interest. This provision enables the Commission to make exemptions from paying an incentive element by class of carrier, and permits the Commission to consider the several factors specifically authorized in the Senate bill.

"The Committee amendment strikes the provision in the Senate bill which would have allowed the Commission to consider the element of value of use of the freight car as the committee was not at all in sympathy with this

proposal nor believed that it was workable.

"Determination of the value of use of the car; namely, what the owning road might have received in terms of revenue from the car had it had the car on its own line instead of being on a foreign carrier is so conjectural and questionable as to be impracticable and essentially is an approach to the problem through penalties rather than through incentive." 112 Con. Record 9945–9946.

Congressman Springer also a member of the House Commerce Committee, emphasized the significance of the substitute language:

"The Senate in 1965 passed out a bill. It is the same bill that your committee brings to you today and we are not going to quarrel with what the other body did on this matter. We, I think, today can work out our differences on this when we go to conference.

"If some of you will look at the bill, S. 1098, that was the Senate bill that we considered. We added a committee amendment and rewrote a good part of that into what is the House version— you will see that we made some really important changes. The Senate passed that bill last year and we passed our version of S. 1098 on October 20, 1965." 112 Cong. Record 9947.

It is quite clear that while the Senate Commerce Committee originally intended to make its incentive bill applicable to all car types and to change the existing basis for determining basic per diem compensation, this proposal was rejected by the House and never became law. There was no conference on the variances between the Senate and House passed bills. The Senate agreed to the House amendments so the bill in the form passed by the House prevailed. Our reading of that language and its legislative history leads us to conclude that, while providing incentive additives for freight cars, the Congress reconfirmed the principle of no more than compensation per diem for the car fleet generally. The additives were restricted to those car types the Commission may find to be needed and in short supply.

The plaintiff railroads further contend that the Commission should have reopened the Dockets No. 31358 and 33145 proceeding and considered car supply factors there rather than in a separate proceeding. We find no requirement or reason compelling such action. We have already observed that such consideration would not have changed the basic per diem rates prescribed since they must rest on cost without incentive factors. Moreover, when the amendment to Section 1 [14] [a] of the Interstate Commerce Act was passed, the basic per diem proceeding had been pending before the Commission for more than 13 years. The Commission and the railroads had spent nearly four years in refixing car costs and providing time and mileage separations following the ruling in Boston & Main R. Co. v. United States, supra. The dispute over basic per diem rates—applicable to all cars—was on the threshold of decision.

The Commission did give consideration to car supply factors before deciding to prescribe only a basic per diem rate in the present order. Less than a month after the statute was amended, the Commission instituted a proceeding to determine appropriate incentive per diem charges. Incentive Per Diem Charges, supra. All railroads in the United States were made parties to the Incentive proceeding. The Commission gave full consideration to all factors specified in the amendment and concluded that the evidence did not warrant the imposition of an incentive charge at this time. There was no question that the proceeding was initiated in response to the passage of the amendment. The Commission stated this clearly:

"Public Law 89–430 of the 89th Congress amended section 1 [14] [a] of the Interstate Commerce Act by adding a provision which requires us in exercising our authority to fix compensation to be paid for the use of any freight car not owned by the carrier

using it, to give consideration to the national level of ownership or such type of freight car and to other factors affecting the adequacy of the national freight car supply and, on the basis of such consideration, determine whether compensation computed solely on the basis of elements of ownership expense should be increased by an incentive element. This investigation was instituted on our own motion on June 23, 1966 to *determine whether information presently available warranted the establishment of an incentive element increase on an interim basis, to apply pending* further study and investigation. [footnote omitted] [emphasis added]." 332 I.C.C. 11 p. 12.

After discussing the evidence adduced and the representations filed by the parties, the Commission concluded:

"Despite participation by 289 of the Nation's railroads the investigation produced no reliable information respecting the quantum of interim incentive charge necessary to meet the statutory standards and we conclude that the information necessary to this decision is not *presently* available. Conclusions in this area must rest upon consideration of economic forces, traffic prospects, earnings reasonably to be anticipated, and other factors which enter into the management decision to embark upon a car acquisition program. They cannot be founded in conjecture and this Commission will not risk the stability and effectiveness of the railroad industry by exercising its authority capriciously." 32 I.C.C. 11, pp. 16–17.

Further investigation in the incentive per diem proceeding is in process. As the Commission noted:

"The Commission therefore has embarked on an investigatory-research program which will use sampling procedures developed and administered by our staff to provide current data on valid car orders and the available supply of operative cars to meet actual needs. Other studies will involve financial and investment analysis relevant to the quantum of the incentive charge. In addition, plans have been made in cooperation with the Department of Transportation for development of standards and specifications for data systems which will provide information as to the manner and volume in which commodities flow in commerce. This will include a detailed survey of user requirements for data covering, among many other factors, equipment used, routes, origins, destinations, stations, distances, rate groups and commodities. We also note that many of the respondents individually are engaged in market and traffic studies which, together with data accumulated by the Association of American Railroads and the Association of Short Line Railroads, can be expected to produce relevant information." 332 I.C.C. 11, p. 18.

The use of a separate proceeding for an incentive per diem inquiry is reasonable and constitutes an appropriate means of implementing the statutory amendment. The amendment does not specify a joint hearing. The two determinations involve collections of different data and evaluations by different statutory standards. The application of the compensatory per diem rate is to all cars, therefore involving all car owners and all car users; the application of incentive per diem limited to cars found to be in short supply affects less than all owners and users. The Commission found in its interim report in the *Incentive* proceeding that the statistical information necessary for a meaningful decision does not presently exist and must be compiled through the efforts of the government and the railroads. The information on which it would make a decision on basic per diem, on the other hand, was already assembled. The basic per diem issue had been pending for an enormous period of time and the outcome of numerous private lawsuits was dependent upon its resolution. To have reopened the basic per diem proceeding necessarily would have delayed such a decision. Under such circum-

stances, the Commission's decision to issue its basic per diem decision without awaiting the completion of investigation of incentive per diem, which bears no direct relation to its prescription of basic per diem, was reasonable and appropriate. The separate proceedings method in any event is not an abuse of administrative discretion. Cr., American Commercial Lines v. Louisville & Danville R. Co., 392 U.S. 571, 88 S.Ct. 2105, 20 L.Ed.2d 1289 [1968].

It is appropriate to indicate that the Congress was aware that a determination of incentive charges was likely to require a lengthy Commission proceeding. There is nothing in the legislative history which suggests that the Congress intended to prohibit the Commission from carrying out its responsibilities in the area of basic per diem until it had completed the *Incentive* proceeding.

Furthermore, when the Commission instituted the *Incentive* proceeding following the enactment of the amendment, many of the plaintiff railroads urged that no decision be reached until the Commission had first prescribed the basic per diem rates. At that time at least there was little question among some of the plaintiff railroads that the basic per diem rate should be decided first.

■ The Congressional purpose is accomplished if the Commission in setting per diem rates, has considered car supply factors by types of cars and, to the extent indicated by those considerations, it exercises its discretionary power to add an incentive per diem to the basic per diem charge. Such consideration may be contemporaneous or, because of the need for extended additional investigation, may follow the determination and prescription of the basic per diem rates. Such consideration may occur in the same proceeding in which the basic per diem rates are being measured and prescribed or, because of the different statutory standards employed, may occur in a different proceeding. The Commission found persuasive reasons to issue its basic per diem report and order now and to continue its investigation in a separate incentive proceeding. The Commission's approach to this complex and long pending problem is an appropriate exercise of its discretion which this Court should not disturb.

■ The plaintiff railroads challenged the Commission's resolution of two accounting issues. The Commission found that per diem rates should reflect both time and mileage factors as opposed to a time factor alone and that the cost base of a car, upon which the per diem is computed, should be determined by a formula which provides different treatment for those elements of expense actually incurred by the owner at the time of purchase and those elements reflecting deferred expenses incurred through borrowing. The plaintiffs also contend that certain findings of the Commission are not supported by any evidence.

Per diem has for years been based solely upon the number of days a car was used by a railroad, without regard to the mileage travelled by the car during those days. This method of computing per diem was criticized in Boston & Maine R. Co. v. United States, supra. On remand, an extensive record was compiled. The Commission concluded that a formula should be presented under which "per diem rates shall be separately calculated, assessed and paid with respect to the number of days cars are held on time and with respect to the number of miles such cars are moved by users in time-haul service." Chicago B. & Q. R. R. Co. v. New York S. & Western R. Co., supra, p. 231. The Commission found that 50 percent of the annual repair and maintenance costs should be distributed among car users in relation to line-haul miles over which they move such cars and 40 percent of the loss in value is allocated to the effect of line-haul mileage and should be so distributed among car users, with the remainder in both instances assigned to time. The time and mileage rates prescribed by the Commission reflected these separations.

The plaintiff railroads do not dispute the Commission's findings that the time and mileage rates prescribed are necessary to effect equitable distribution of car ownership costs among car users, but contend that such rates, adopted without regard to the incentive elements of the amendment to Sections 1 [14] [a] of the Interstate Commerce Act make the car supply problem more severe. In other words, their objection to the Commission's decision is that it did not prescribe rates with a view towards increasing the car supply.

This Court has previously observed that the function of basic per diem is to compensate the owner of a car for the expenses of ownership and maintenance. Car supply factors have no relevance to the computation of such per diem. The Commission's findings that both time and mileage factors should be taken into consideration in the computation of basic per diem and the amount of such ownership costs which should be attributed to each factor are fully supported by the record and represent a sound exercise of its administrative function.

The plaintiff railroads placed great stress on the argument that the effect of the Commission's order prescribing time/mileage rates would defeat the Congressional purpose in passing the amendment because it would reduce substantially the rate which a car using railroad is required to pay to hold a car on its sidings inasmuch as the time portion of the time/mileage rates are less than the present time only rates. Two relevant considerations come into play in this regard. An incentive per diem may be added to those car types found to be in short supply when the information necessary to make such a finding is available. And, short of that determination, if any railroad is in fact leaving cars sitting unused on a siding, the Commission has ample power under Section 15 [1] of the Interstate Commerce Act to issue a car service order, requiring the particular railroad to send the cars where they are needed. This power has been exercised by the Commission for many years, and,

as noted earlier, a proceeding is now being conducted to investigate possible means of making the car service powers an even more effective tool to achieve better utilization of the existing freight car supply.

We therefore consider that the Commission properly rejected a consideration of car supply factors in the computation of basic per diem. Furthermore, in finding that a reasonable determination of car ownership costs required payment by all railroads of rates on a time and mileage basis it exercised a judgment well within its discretion which should not be disturbed.

■■ The plaintiff railroads object to the Commission's determination of a second accounting issue, its decision to reject a reproduction cost value base for cars and to set the rental rate level without giving consideration to the effect its choice of cost base would have on car supply. The plaintiff railroads proposed a computation of depreciation, not of incurred car cost, but based on the present cost of replacement of the car. They also proposed that their return on investment should be computed on the same replacement cost new, depreciated to date.

The Commission's limitation under the statutory amendment has been discussed in previous portions of this Memorandum. In prescribing the basic per diem charge the Commission may only compensate the owner of the car for ownership and maintenance costs, including a fair return on value.

The Commission noted that the Congress rejected a proposal to create a new "value of use" standard for basic per diem rates. The amendment made no change in the statutory standard for determining basic per diem. The Commission found that in defining the present basis for determining basic per diem rates as including "a fair return on value" the Congress did not define "value" as meaning reproduction cost-new rather than ledger value or present value. Chicago B. & Q. R. Co. v. New

York S. & Western Railroad Co. supra, p. 202.

However, while rejecting the use of reproduction cost as the base for calculation of depreciation and interest, the Commission did find "that the consideration of fair and reasonable per diem charges under modern conditions does require an allowance to car owner for the loss in purchasing power of corporate funds invested in the car. Ibid, p. 201. In determining the extent to which such an allowance should be made, the Commission found that railroads do not finance the entire cost of purchase or construction of cars out of their own funds. It determined that the average actual cost borne by the owner approximates 20 percent, and the remaining 80 percent is obtained through various security devices, such as equipment trusts or conditional purchase agreements, wherein both the total amount to be paid and the rate of interest to be paid are fixed by agreement. Moreover, car owners pay to the underwriters of equipment obligations only the same number of dollars originally borrowed, and repayment of principal and interest is effected in dollars of current value at the time of payment. Car owners incur no increased liability to lenders due to the reduction in the purchasing power of the repayment dollars. For this reason the Commission decided that car owners should not receive from user a contribution measured by this inflation. The Commission found that the cost basis of cars should be constructed upon the following principles:

"We find that the construction of fair and reasonable per diem charges under modern conditions does require an allowance to car owners for the loss in purchasing power of corporate funds invested in the car. The annual cost of owning and maintaining per diem cars should include, in addition to repair and maintenance costs and provision for property taxes, a portion of the capital expended by the owner for its purchase, together with interest on the uncovered balance, and amounts necessary to make payments of principal and interest on funds acquired through issuance of fixed liability securities to finance the purchase. Only the portion representing corporate funds invested in the car by the owner should be subject to the adjustment reflecting changes in purchasing power." Chicago B. & Q. R. Co. v. New York, S. & Western Railroad Co., supra, p. 201.

In determining "the portion representing corporate funds invested in the car by the owner", the Commission took into account both the down payment and various other factors. It devised a formula which provides for applying a reproduction cost standard to 40% of the cost of the car, representing the amount actually expended by the car owner, and an original cost standard to the remaining 60%, which represents the amount financed through borrowing. The formula further allows interest at the rate of 9% on the amount actually expended by the car owner and 4% on the borrowed amount—or a composite rate of 6%. This was found by the Commission to constitute "just and reasonable compensation to car owners for all costs of interest on investment and borrowed funds, including a fair return on the value of their investment and allowance for losses in purchasing power of invested funds. Ibid, at p. 214.

The plaintiff railroads contend that the debt/equity separation of 80%–20% the Commission found as the average means of financing new railroad equipment, which is one of the components for computing the car/line rate, is not supported by evidence of record, and that the Commission's findings as to the cost of capital are not supported by sufficient evidence.

The Commission's finding as to the proportion of debt and equity was in part an adoption of the hearing examiner's conclusion. He stated:

"The evidence requires the finding that few carriers finance the entire cost of purchase or construction of new cars out of retained funds. Commonly the larger part of the needed amounts is

obtained through loans secured by equipment trusts or conditional purchase agreements. Not infrequently, the term for repayment of principal is 15 years, with interest on the unpaid balance varying between 2 and 6 percent. [Footnote omitted]. While the actual portion of the cost borne by the owner in the first instance varies widely, the most common is twenty percent." Recommended report, p. 56.

There was independent and uncontested evidence of record to support the conclusion reached. The acceptance of this determination by the hearing examiner was a reasonable exercise of administrative discretion.

The Commission's decision as to a reasonable return on the invested and borrowed portion of the original cost of freight cars rested upon expert judgment as well as upon sufficient evidence. The Commission held:

"A rate of 4 percent after Federal income taxes is reasonably related to the return generally available from investments having similar risks. It compares with a return earned by railroads from freight service in 1960 of 4.5 percent after taxes and our conclusions in cases of similar reciprocal charges based upon cost, that 4 percent after taxes produced a fair return on value. Switching at Richmond, Va., 245 I.C.C. 293, 298; Switching Charges at Detroit, Mich., 301 I.C.C. 75, 82; Routing Cancellation at Waterloo, Iowa, 302 I.C.C. 477, 485. A fair return on the present value of the owner's investment requires consideration of the changes which are reflected in the Account No. 53 index of freight car costs and generally shown in tables I and II, supra. Employing this index as a guide, we conclude that interest at a rate of 9 percent before taxes on the portion of original cost herein allowed as representative of the average ownership investment, which produces approximately 5.5 percent after taxes, provides a fair return on the value of the investment, adequately compensates owners for the impact of inflation, and

includes those elements of cost which should be shared by car users." Chicago, B. & Q. R. Co. v. New York, S. & Western R. Co., supra, p. 213.

Certain railroads sought to introduce new evidence after the close of the record by including it in their exceptions to the hearing examiner's report, to support a substantially higher rate of interest measured by the average cost of equity capital of some but not all railroads. The Commission ordered the evidence stricken and denied a request for further hearing for the purpose of receiving the material presented in the exceptions and additional related data. Such a matter is within the Commission's discretion.

It is appropriate to note that in a proceeding as complex as this one, the Commission's judgment and expertise are necessary commitments of the result. As the Commission itself observed:

"Where the costs and apportionments involved herein susceptible of precise and indisputable calculations and application, there would be no need for recourse to this Commission. It is the existence of these numerous and extensive areas of imprecision, as well as the opposing theories as to methods of calculating and distributing the costs that make necessary the application of expertise and judgment." 332 I.C.C. 176, 205.

We find that the Commission's determination that the calculation of depreciation and return elements of car time rates should be based on original costs and not reproduction costs are supported by the record and represent a sound exercise of its administrative function. The plaintiff railroad's contention that the Commission erred in adopting a formula not specifically suggested by any party is without substance. Moreover, the formula ultimately adopted by the Commission was first prepared by the hearing examiner in his recommended report and order. All of the parties had an opportunity to debate the issue in their exceptions to the report and thus had an opportunity to be heard prior to a final determination by the Commission.

As the formula prescribed by the Commission is appropriate and represents a valid exercise of judgment well within its discretion to make, it should not be disturbed.

Accordingly, an order shall be entered dismissing the complaints and dissolving the preliminary injunction.

LAY, Circuit Judge (concurring):

The literal interpretation of Section 1 (14) (a) of the Interstate Commerce Act (49 U.S.C. § 1(14) (a)) seems to require the Commission to consider the incentive rates along with the per diem rates and simultaneously in the same proceeding to make a deliberate choice between the two, based upon car supply factors. I have difficulty in rationalizing that the Commission has in fact made a deliberate choice as directed. I nevertheless think that the Commission has substantially complied with the mandate of the statute in temporarily applying the per diem rate and deferring "judgment" as to the quantum of incentive rates necessary. I say this for several reasons:

First, a remand would not accomplish any meaningful purpose. It would simply delay the effective date of the new per diem rates. Yet we today approve these rates and in doing so, we have deferred to the Commission's judgment that they constitute the best and wisest policy of compensation over any other method available. Further delay would only result in the continued use of the older and inferior method of per diem charges without utilization of mileage factors.

Secondly, the postponement by the Commission of the determination of incentive rates arose because there was not satisfactory evidence available on which to base incentive rates necessary to accomplish the desired end of the statute. Under Section 1(14) (a), incentive rates are subject to the Commission's *judgment*. Thus, there exists an area of discretion as to the specific applicability of incentive rates in any given case. Certainly, if the Commission concludes that a certain incentive rate for any particular car will not "contribute to sound car service practices * * * and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and the national defense," it would be arbitrary to apply the same. Cf. Palmer v. United States, 75 F.Supp. 63, 75 (D.D.C.1947).

Thirdly, to urge a remand for the sole reason that the incentive rates hearing was not carried on in the same proceeding as the hearing for per diem rates would be to stress procedural formalism without just reason. The statute makes no such specific requirement. It only commands that car supply factors guide the Commission's determination of what rates should be applicable.

Fourth, to say the statute requires the delay of the new per diem rates until the incentive rates are to be applied is unrealistic. If so, the quick solution might be to continue the new per diem rates and then to apply the incentive factors retroactively. However, this would not be consistent with the spirit of the statute, since the primary purpose of the incentive rates is to induce future action, not merely to compensate the owners for past usage.

I conclude that the Commission must act, as soon as practicable, to set incentive rates on the basis of inadequacy of car supply. It has the affirmative duty to do so. It cannot totally refuse to do so, even if it has second thoughts and now feels the legislation is unwise or impractical. Passing upon wisdom of congressional policy is not the proper role of the Commission. However, I do not read the Commission's proceedings as announcing abdication of their responsibility. I sense only, at this time, a dedication to study in order to competently and effectively reach the desired effect Congress has set forth.

VAN PELT, District Judge (dissenting):

It is with regret that I express disagreement with the holding of my col-

leagues affirming the Commission's action in this case.

I am in agreement that the House Bill was the one adopted and that comments as to the effect of adopting the Senate version are inappropriate. I also agree with the conclusion that the division approved by the Commission is sufficiently based upon evidence before the Commission that we should accord great weight to the division which the Commission approved.

My disagreement is in the area of congressional intent. Railroad car shortages have been an important public issue for years. For more than a decade prior to the Commission's decision now before us the Interstate Commerce Commission had before it this proceeding to increase per diem rates and thus afford some remedy for this evil. Under the guise of lack of information and that as it was investigating the situation, the proceeding remained undecided. During this delay car shortage became more acute.

The Congress thereupon properly decided to do something about it. The result was the enactment of an amendment to Section 1(14) (a) of the Interstate Commerce Act. It provided in the amendment certain language italicized in the majority opinion and which I repeat italicizing the word "shall" :

"In fixing such compensation to be paid for the use of any type of freight car, the Commission *shall* give consideration to the national level of ownership of such type of freight car and to other factors affecting the adequacy of the national freight car supply, and *shall*, on the basis of such consideration, determine whether compensation should be computed solely on the basis of elements of ownership expense involved in owning and maintaining such type of freight car, including a fair return on value, or whether such compensation should be increased by such incentive element or elements of compensation as in the Commission's judgment will provide just and reasonable compensation to

freight car owners, contribute to sound car service practices (including efficient utilization and distribution of cars), and encourage the acquisition and maintenance of a car supply adequate to meet the needs of commerce and the national defense."

In the House Report recommending this legislation, it is stated:

"If the committee amendment is enacted, the Commission in fixing compensation under existing section 1(14) (a) of the Interstate Commerce Act will be empowered, *in the same proceeding,* to go beyond the basis of elements of ownership expense in computing compensation. Where warranted consideration may be given as to whether such compensation should be increased by an incentive element or elements which will encourage acquisition and maintenance of an adequate car supply. This will be a discretionary power \* \* \*." See House Report No. 1183, 2 U.S.Code Congressional and Administrative News, 1966, p. 2230.

Under the Commission order now affirmed by my colleagues, a rate is promulgated which admittedly has been established without consideration of the factors which the Congress said shall be considered. Instead of considering these factors in this case, as the House of Representatives expected, as shown by the words "in the same proceeding", it has set up a separate proceeding. Whether it will pend a decade or more, as this case has, is speculation. It is not speculation that the congressional will and intent has been disregarded by the Commission. It is not speculation that a serious car shortage exists. According to the House Report, *supra,* there is "recurring national shortages of railroad freight cars." These shortages so affect the national economy that the Congress properly gave directions to the Interstate Commerce Commission as to the elements which the Commission shall consider "in its setting of the rates of compensation to be paid for the use of any type of freight car." Congress, in

view of the car shortage and the Commission's inaction, was within its rights in using the mandatory "shall" and in attempting to prevent the Commission from doing what it now proposes to do, namely, start another proceeding, with endless hearings and examinations by requiring that its action be taken in the same proceeding in which it "fixes compensation." I feel this court should insist that the mandate of the Congress be carried out now. I would set aside the Commission order and refer the case back to the Commission to make the determination in this proceeding in the manner the Congress intended.